UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DINEAN DAVIS, individually and on behalf
of her infant child, J.D.,

                        Plaintiff,

        -against-

WINSTON PREPARATORY SCHOOL,
WILLIAM DEHAVEN, and SANDY
HAGERTY,

                        Defendants.

**MEMORANDUM
OPINION & ORDER**

21 Civ. 8209 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

Plaintiff Dinean Davis brings claims of race, gender, and disability discrimination against Defendants Winston Preparatory School ("Winston Prep" or the "School"), William DeHaven, and Sandy Hagerty (collectively "Defendants") pursuant to 42 U.S.C. § 1981, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 et seq., the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 et seq. Plaintiff's claims are premised on the expulsion of Plaintiff's minor son, J.D., from Winston Prep in March 2020.

Defendants have moved to dismiss the Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 56)

For the reasons stated below, Defendants' motion to dismiss will be granted in part and denied in part.

# BACKGROUND

## I.      FACTS[1]

### A.      The Parties

Plaintiff Dinean Davis is the mother of J.D., a former student at Winston Prep. (Am. Cmplt. (Dkt. No. 41) ¶ 9)  J.D. is male and African American.  (Id. ¶ 2)  He first enrolled at Winston Prep in the fall of 2017.  (Id. ¶ 44)

Defendant Winston Prep is a private school located in Manhattan that educates "special needs students through 12th grade, providing education to students with learning differences such as dyslexia, nonverbal learning disability and executive function disability." (Id. ¶¶ 10, 19)

The Amended Complaint alleges that Defendant William DeHaven is the headmaster of Winston Prep, while Defendant Sandy Hagerty is the school's dean.  (Id. ¶¶ 12-13)

### B.      Winston Prep

Winston Prep is "spread across seven campuses throughout the Tri-state area."  Its flagship location is in Manhattan's Chelsea neighborhood.  (Id. ¶ 20)  The Chelsea campus "is a high school[] consisting of students with a variety of learning disabilities and special needs." (Id.)  The "majority of the student population at Winston Prep in Chelsea consists of white students from affluent families."  (Id. ¶ 23)  The "minority students of color [are] predominantly African American and Hispanic[.]"  (Id.)

Winston Prep "maintains a Nondiscrimination Policy and claims the [s]chool provides equal opportunity in the administration of its educational programs and services[.]"  (Id.

---

[1]  The Amended Complaint's well-pled factual allegations are presumed true for purposes of resolving Defendants' motion to dismiss.  Swierkiewicz v. Sorema N. A., 534 U.S. 506, 508 n.1 (2002).

¶ 21)  According to the Amended Complaint, however, "the Nondiscrimination Policy is, at best, aspirational, and poorly executed and enforced." (Id. ¶ 22)  And Defendant DeHaven, in particular, "contributed greatly to the culture of intolerance on the Chelsea campus, in both his willful indifference to the racism practiced by . . . bullies [there] and his own discriminatory conduct." (Id. ¶ 24)

"On multiple occasions between 2017 and 2020, DeHaven was overheard by students, teachers, and parents, including Plaintiff, minimizing the seriousness of racial epithets when used against the African American students of Winston Prep[.]" (Id. ¶ 25)  During one such incident in the fall of 2017,

> [s]tudents were lined up on the steps in front of the school with DeHaven present. An African American student approached DeHaven and informed the Headmaster that certain white students [had] "called [him] nigger."
>
> DeHaven responded to the African American student with his go-to explanation used to excuse this specific despicable behavior (as the n-word was uttered way too often at Winston Prep), "Well, with their learning difficulties, they may not know what they are saying."

(Id. ¶¶ 27-28)

"According to multiple witnesses, . . . [this] hateful slur was said 'a lot[]'" at Winston Prep, and "DeHaven was overheard using this rationalization on multiple occasions when African American students were bullied and called the 'n-word.'" (Id. ¶¶ 28-29) "DeHaven rarely, if ever, cited minority students' learning disabilities to excuse poor behavior," however. (Id. ¶ 30)

According to the Amended Complaint, "between 2017 and 2020" "DeHaven, as well as other disciplinarians at Winston Prep, practiced two standards of discipline: a lax, understanding standard for the affluent white students, and a harsher, inflexible standard used to punish students of color[.]" (Id. ¶ 31)

Many of the minority students, like [J.D.], had the notably high tuition at the private high school paid with funding from the Board of Education or federal grants. It was customary, when a minority student engaged in poor behavior, for DeHaven to threaten the student with their loss of funding for this great opportunity. The Headmaster would warn the minority students that, if they don't refrain from poor behavior, he would "get rid of [them]" or "send [them] back" to public education and/or [public] housing.

With regard to discipline for behavioral issues, white students would receive warnings, proverbial slaps-on-the-wrist or no discipline for the same conduct for which African American students would face detention, suspension or expulsion. The two different standards of discipline were well-known among the students of color, including J.D., who experienced the double standard first-hand. Between 2017 and 2020, African American students, including [J.D.], would routinely receive harsher punishments (ranging from admonitions to detention to suspensions) for generally innocent, if not expected, adolescent behavior including but not limited to speaking in class, particularly if two black students would speak with each other, as well as playful roughhousing in the halls, gym or on recess, loud/boisterous behavior, cursing, inappropriate, juvenile jokes, or insulting one another. The black students would routinely receive harsher punishment than their white counterparts for similar such behavior. Nonetheless, despite the harsher punishment and the excessive use of racial slurs towards African American students, DeHaven would dismissively and falsely proclaim, "Racist things don't happen here."

(Id. ¶¶ 31-32) (second and third alterations in original)

The Amended Complaint further alleges that

[o]ne African American female student known to Plaintiffs was called to DeHaven's office and chastised for wearing jeans with holes in them. Despite the fact that her white classmates wore their jeans with holes in all the same places, the black student was told she could not wear the jeans because her body type was "different." She was forced to change her clothes.

(Id. ¶ 34) Moreover, "one white male teacher . . . would stand in the hallway and only question the African American students walking by without incident, asking them, 'Where are you supposed to be?' as if they were less likely to have permission to be in his hallway than white students." (Id. ¶ 35)

Plaintiff also complains that DeHaven "rejected a group of African American students' attempt to form an Affinity group for students of color," even though the school

"previously approved the formation of an Affinity group for LGBT students." (Id. ¶¶ 36-37)

(footnote omitted)

The Amended Complaint also describes a controversy at the school concerning

the display of a Black Lives Matter sign:

> [A]n African American female teacher hung a sign in her cubicle which contained the slogan, "Black Lives Matter" in the Fall 2017 semester. The slogans "Love is love" and "A woman's right to choose" also adorned [the teacher's] cubicle. DeHaven and another Winston Prep male teacher took issue with the BLM sign.

> The male teacher complained, "If I don't believe these things, then I'm not welcome in this space, you must take them down," and his complaints led to a formal meeting between him, the African American teacher and DeHaven.

> At the meeting, DeHaven told the African American teacher, "There are many who hold conservative views here. You have to take the [Black Lives Matter] sign down."

> The teacher refused to take the sign down on principle, particularly since Winston Prep publicly made many token statements of inclusivity and claimed to be against discrimination.

> When the African American teachers refused to remove the "Black Lives Matter" sign, DeHaven ordered the school custodial staff to remove the BLM sign from the African American teacher's wall after she went home for the night. Many of the students of color, including J.D., noticed the sign's removal, and were upset by it. The African American teacher had no explanation for Defendants' actions.

(Id. ¶¶ 38-42) (alterations added)

Finally, the Amended Complaint alleges that in August 2017 – during "a teacher's

workshop on race known as 'Border Crossers'" – DeHaven "had to be forced to attend" and

"refused to engage in the exercises or scenarios the workshop leaders used in order to get the

attendees involved to discuss and, ideally, improve the racial tension at Winston Prep." (Id. ¶ 43)

During the workshop, "there were no more than five . . . African American teachers, or teachers

of color, so the African American teachers sat up front during the workshop and the African

American administrative staff members were pressured to sit up front with the minority

teachers." (Id.)  In addition, "some of the attendees mentioned how the 'n-word' was 'said a lot' at Winston Prep," and "[o]ne of the leaders of the workshop noted [that] the Winston Prep faculty was 'the worst, most resistant group' they had experienced." (Id.)

###    C.    J.D.'s Experience at Winston Prep

J.D. enrolled at Winston Prep in the fall of 2017.  (Id. ¶ 44)  J.D. arrived "as an eighth-grade student with anxiety and a wide array of severe learning disabilities." (Id. ¶ 48) J.D.'s learning challenges "were severe enough that the NYC Department of Education agreed to pay the majority of the $68,500 tuition for Winston Prep," after determining that "the public school system was incapable of accommodating his special needs." (Id. ¶¶ 44, 48)

"After years of struggling at numerous schools, J.D. thrived academically at Winston Prep." (Id. ¶ 44)  J.D.'s teachers "described him as [a] 'wonderful, thoughtful and caring' young man, who 'did well [academically], got the hang of his classes relatively quickly, and contributed to the school community.'" (Id. ¶ 45) (second alteration in original)

"Despite his academic achievement, [however,] J.D. received an excessive amount of punishment that was not commensurate to his behavior and, noticeably, in excess of that imposed on white students." (Id. ¶ 46)  The Amended Complaint alleges that

> J.D. was reprimanded for "speaking too loudly" during a free period break, while his white peers were similarly loud during this free time;
>
> J.D. was frequently chastised for speaking with his black friends during classes, while the white students would not get scolded for speaking, or worse behavior, by the same teachers;
>
> In one class in particular, J.D. was moved from sitting next to his friend, another African American student, in class because the teacher decided "they distract each other;" though white students who spoke with each other were never separated in this fashion;
>
> J.D. was deemed disruptive for excitedly participating in class, while his white counterparts, who participated with the same level of enthusiasm and volume, were not reprimanded;

> J.D., and his African American friends/colleagues, were consistently punished more harshly than white students for typical, innocent, adolescent behavior including but not limited to speaking in class, particularly if two black students would speak with each other, as well as playful roughhousing in the halls, gym or on recess, loud/boisterous behavior, cursing, inappropriate, juvenile jokes, or insulting one another.

(Id. ¶ 47)

In October 2019, J.D. – who was then 15 years old – was "cyberbullied by two younger white girls." (Id. ¶ 51) The girls

> first sent [J.D.] sexually inappropriate text messages, including graphic descriptions of sexually transmitted diseases.

> The text messages persisted despite J.D. demanding they stop. The girls then scared J.D. by threatening him with one of the girl's older brother who, they told Plaintiff, was in a gang. . . . The girls texted and messaged J.D. incessantly, forcing J.D. to block them on text and social media. The girls persisted in their harassment and cyberbullying, by cyberstalking him on Snapchat, and phone calls from different blocked numbers. . . .

> [J.D.] was both fed up and scared by the harassment and cyberbullying. A friend of J.D.'s came to his defense and texted the girls, threatening them to prevent further harassment. The two girls brought the friend's text to DeHaven and Dean Hagerty. DeHaven and Hagerty immediately disciplined J.D. for the friend's text, without giving him an opportunity to defend himself with his side of the story. Plaintiff was prohibited from attending a class field trip as punishment.

(Id. ¶¶ 51-53) After J.D.'s mother was notified of this incident, she contacted Defendants DeHaven and Hagerty. (Id. ¶ 54) However, "no discipline for the girls followed." (Id. ¶ 55) Instead, "Defendants explained to J.D.'s mother" that the incident "was the product of 'younger girls having a crush' on J.D." (Id.)

J.D. was also "repeatedly taunted by an Asian-American student, who mocked [J.D.'s] limited abilities as a basketball player," and "question[ed] him on how a black student could be so horrible at basketball." (Id. ¶¶ 56-57) While J.D. "attempted to ignore the Asian-American student," "after numerous attacks, J.D. made an inappropriate reference, and told the boy to 'go eat an egg roll.'" (Id. ¶ 57) J.D. was "immediately scolded and disciplined by

Defendants." (Id.)  However, when J.D. "informed Defendants of the Asian-American student's

persistent racist taunts, he was informed the boy was on the Autism spectrum as an excuse for his

behavior." (Id. ¶ 58)

The Amended Complaint also alleges that J.D. "was frequently targeted by an art

teacher, Ms. Miller, who was known among the parents and some staff members as particularly

unfriendly to students of color." (Id. ¶ 59)  The art teacher

> scolded [J.D.] incessantly, despite his conduct being no worse or different than his
> white classmates.  Ms. Miller was so vicious toward J.D. that he eventually asked
> her, "Why do you hate me so much?"
>
> . . . [J.D.] was forced to participate in art outside of Miller's classroom, in
> Hagerty's office.  The reason[s] for this removal were never made clear to [J.D.]
> or his mother.

(Id. ¶¶ 59-60)

J.D. was also "the victim of inappropriate physical contact and further threats of

violence by a substitute teacher during his sophomore year":

> In early February 2020, Mr. Wilder, a frequent substitute at Winston Prep,
> physically pushed [J.D.] because he was late for a class.  Wilder subjected J.D. to
> a profanity-laced tirade which culminated with the threat, "If you weren't a
> student, I'd really put my hands on you."

(Id. ¶ 61)  When J.D.'s mother questioned Defendants about this incident, Defendants "claimed

the substitute teacher would be reprimanded and assured he would no longer be put in a position

to threaten a child." (Id. ¶ 62)  However, J.D. "encountered Wilder weeks later when he served

as a substitute in another class [J.D.] attended." (Id.)  J.D. was "anxious in Wilder's presence,

and he feared for his safety throughout the class." (Id. ¶ 63)

### D.    J.D.'s Expulsion from Winston Prep

In January 2020, J.D., age 15, and X.Y., age 14, were "invited to engage in a

sexual encounter" at the home of Jane Doe, an 18-year-old "half-white, half-Asian-American

student from an affluent family." (Id. ¶¶ 65-66)  Neither J.D. nor X.Y. "had a sexual experience

prior to this January 2020 encounter." (Id. ¶ 66)  But, J.D., X.Y., and Jane Doe "engaged in

sexual intercourse[.]" (Id.)  "At Jane Doe's urging, part of the sexual encounter was videotaped."

(Id. ¶ 67)  "The digital video recording was later possessed by all three students[.]" (Id.)

       In the weeks that followed, "Jane Doe and J.D. discussed 'hooking up' again, both

verbally and via text message." (Id. ¶ 68)  In the final week of February 2020, J.D. and Jane Doe

"agreed to meet for another sexual encounter, but then changed their respective minds." (Id. ¶

69)

       In late February and early March 2020, Jane Doe and J.D. again discussed

"hooking up":

> On February 27, 2020, Jane Doe texted J.D. asking him if he wanted to "H[ook]
> up." J.D. was slow to respond, so Jane Doe followed up with "Nvm [never mind]
> Wrong person."
>
> On March 1, 2020, J.D. responded to the aforementioned texts with "Tmr?
> [tomorrow?]." The two then agreed to meet at school the next day.
>
> Jane Doe ended the text exchange with, "But u know I'm 18 right" followed by
> "And if u tell anyone I can get arrested." J.D. assured [Jane Doe] he would not
> tell anyone and suggested they meet after school.
>
> On March 2, 2020, Jane Doe canceled the meeting because she had choir practice.
> J.D. suggested the following day.
>
> On March 3, 2020, at 7:29 a.m., Jane Doe told J.D. they were "done," and she was
> "not doing it anymore." J.D. joked, "U know have videos" and "Do u want me to
> show u" before sending her the video which all three participants from the
> January 2020 encounter possessed.
>
> J.D. did not write anything further. Jane Doe asked Plaintiff if he was threatening
> her, then immediately said she would "DO IT!!! OKAY JUST DELETE IT AND
> I'LL DO IT."

(Id. ¶¶ 70-75) (last alteration added and emphasis in original)

In response, J.D. "immediately deleted the video." (<u>Id.</u> ¶ 76) According to the Amended Complaint, J.D.'s texts were "not meant as a threat of any kind," and J.D. "never intended to share the video with anyone new[.]" (<u>Id.</u>)

Later that morning, J.D. texted Jane Doe "Nvm [never mind]." (<u>Id.</u> ¶ 78) When J.D. saw Jane Doe in person in school that morning, he "informed her, in person, that he deleted the video," and "further assured her that he never shared the video with anyone else." (<u>Id.</u> ¶ 79)

Later on March 3, 2020, Jane Doe "spoke with a teacher . . . to ask if she could get in trouble for sleeping with the 15- and 14-year-old underclassmen." (<u>Id.</u> ¶ 80) Jane Doe also referenced "J.D. and the video in her discussion with the teacher." (<u>Id.</u>)

After speaking with Jane Doe, the teacher brought her to speak with Defendant DeHaven. (<u>Id.</u> ¶ 81) After speaking with Jane Doe, DeHaven summoned J.D. to his office. (<u>Id.</u> ¶¶ 82-83) DeHaven's tone was "adversarial and aggressive," and he "did not let [J.D.] explain anything, defend himself or in any way share his side of the story." (<u>Id.</u> ¶ 85) When DeHaven asked J.D. if he had exchanged text messages with Jane Doe, J.D. "answered in the affirmative[.]" (<u>Id.</u>) DeHaven did not "review the text messages" himself. (<u>Id.</u>) When DeHaven asked J.D. if there was a video, J.D. also "answered in the affirmative." (<u>Id.</u> ¶ 86)

According to the Amended Complaint, "Defendants made the decision to remove J.D. from Winston Prep[] in the afternoon of March 3, 2020[.]" Defendant Hagerty called J.D.'s mother, directed her "to 'come pick up' J.D.," and told her that J.D. "had consensual sex with another student." (<u>Id.</u> ¶ 89) When J.D's mother arrived to pick up her son, Hagerty and DeHaven falsely told her that Jane Doe was 17. (<u>Id.</u> ¶ 90) DeHaven "provided minimal detail to [J.D.'s mother] and assured her that [J.D.] would only be suspended temporarily." (<u>Id.</u> ¶ 93)

When discussing the sexual encounter between J.D., X.Y., and Jane Doe, DeHaven "excused the behavior saying, '[k]ids make mistakes.'" (Id. ¶ 94)

The next morning – March 4, 2020 – DeHaven emailed J.D.'s mother "to inform her [that], '[a]fter discussion with you and careful consideration, we have decided to terminate the enrollment of your son[.]'" (Id. ¶ 99)  DeHaven "did not discuss the matter further" with J.D.'s mother.  (Id. ¶ 100)  On March 6, 2020, DeHaven "canceled a rescheduled meeting, again denying [J.D.'s mother] an opportunity to provide J.D.'s side of the story." (Id. ¶ 109)

Winston Prep did not discipline Jane Doe for her sexual intercourse with the 15-year-old J.D. and the 14-year-old X.Y.  (Id. ¶ 106)

After J.D.'s expulsion, Winston Prep "refused to help [J.D.] with regard to his obtaining alternate appropriate education[.]" (Id. ¶ 115)  J.D. was "forced to return to public school, despite the Board of Education's previous determination that the city schools were incapable of addressing J.D.'s severe learning disabilities and could not provide an appropriate education."  (Id. ¶ 120)

## II.    PROCEDURAL HISTORY

The Complaint was filed on October 5, 2021.  (Dkt. No. 1)

On February 17, 2022, this Court conducted a pre-motion conference to discuss Defendants' anticipated motion to dismiss.  Later that day, this Court entered an order granting Plaintiff leave to file an amended complaint.  (Dkt. No. 36)

Plaintiff filed the Amended Complaint on March 18, 2022.  (Dkt. No. 41)

On April 7, 2022, Defendants moved to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim.  (Dkt. No. 56)  Plaintiff filed an opposition brief on August 1, 2022  (Dkt. No. 60), and Defendants filed a reply on August 23, 2022.  (Dkt. No. 59)

# DISCUSSION

The Amended Complaint asserts claims of race discrimination against Defendants

Winston Prep, DeHaven, and Hagerty pursuant to 42 U.S.C. § 1981 and the NYSHRL.  (Am.

Cmplt. (Dkt. No. 41) ¶¶ 135-46, 179-87)  The Amended Complaint also asserts claims against

Winston Prep for race discrimination pursuant to Title VI, gender discrimination pursuant to Title

IX, and disability discrimination pursuant to the ADA and Section 504 of the Rehabilitation Act.

(Id. ¶¶ 147-78)

Defendants contend that the Amended Complaint should be dismissed for failure

to state a claim.[2]  (Def. Br. (Dkt. No. 57) at 5-6)[3]

## I.    LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal,

556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

"In considering a motion to dismiss[,] . . . the court is to accept as true all facts alleged in the

complaint," and must "draw all reasonable inferences in favor of the plaintiff."  Kassner v. 2nd

Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007).  A complaint is inadequately pled "if it

tenders 'naked assertion[s]' devoid of 'further factual enhancement,'"  Iqbal, 556 U.S. at 678

---

[2]  In their motion, Defendants also assert that the Amended Complaint should be dismissed "pursuant to Fed. R. Civ. P. 12(b)(1)."  (Mot. to Dismiss (Dkt. No. 56) at 1)  Defendants' brief (Dkt. No. 57) does not make any argument under Rule 12(b)(1), however, and the Amended Complaint is premised on, inter alia, alleged violations of Federal statutes, including 42 U.S.C. § 1981, Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 et seq., the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. Accordingly, to the extent that Defendants' motion to dismiss is premised on Rule 12(b)(1), the motion will be denied.
[3]  The page numbers of documents cited in this opinion correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

(quoting <u>Twombly</u>, 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." <u>Port Dock & Stone Corp. v. Oldcastle Northeast Inc.</u>, 507 F.3d 117, 121 (2d Cir. 2007) (citing <u>Twombly</u>, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice [to establish entitlement to relief]." <u>Iqbal</u>, 556 U.S. at 678.

In resolving a motion to dismiss, a court may "consider . . . the complaint and any documents attached thereto or incorporated by reference and documents upon which the complaint relies heavily." <u>Bldg. Indus. Elec. Contractors Ass'n v. City of N.Y.</u>, 678 F.3d 184, 187 (2d Cir. 2012) (citation and quotation marks omitted).

## II.    <u>SECTION 1981 RACE DISCRIMINATION CLAIM</u>

Defendants argue that Plaintiff's race discrimination claim under 42 U.S.C. § 1981 should be dismissed for failure to plead facts giving rise to a plausible inference that race was the "but-for" cause of J.D.'s expulsion from Winston Prep.  (Def. Br. (Dkt. No. 57) at 11-14)

### A.    <u>Applicable Law</u>

42 U.S.C. § 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).  The phrase "make and enforce contracts" includes "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." <u>Id.</u> ¶ 1981(b).

Section 1981 prohibits discrimination in the "'enjoyment of benefits, privileges, terms, and conditions of a contractual relationship[.]'" <u>Robinson v. Concentra Health Servs.</u>,

Inc., 781 F.3d 42, 45 (2d Cir. 2015) (quoting Patterson v. Cnty. of Oneida, 375 F.3d 206, 224 (2d Cir. 2004). To state a claim under Section 1981, a plaintiff must plausibly allege that "(1) [he or she] is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.)." Mian v. Donaldson, Lufkin & Jenrette Sec. Corp., 7 F.3d 1085, 1087 (2d Cir. 1993); Silva v. Farrish, 47 F.4th 78, 90 (2d Cir. 2022) (same).

      To satisfy the intent requirement under Section 1981, a plaintiff must "plead . . . that, but for race, [he or she] would not have suffered the loss of a legally protected right." Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media, 589 U.S. 327, 341 (2020); see also Lively v. WAFRA Inv. Advisory Grp., Inc., 6 F.4th 293, 303 (2d Cir. 2021) ("The Supreme Court has clarified recently that the but-for causation standard for discrimination claims applies not only at trial but at the pleading stage as well." (citing Comcast, 589 U.S. at 331-32)). "[A]n [adverse] action may[, of course,] have multiple but-for causes." Shamciyan v. Acacia Network, Inc., No. 22 CIV. 2122 (JPC), 2023 WL 6214546, at *6 (S.D.N.Y. Sept. 24, 2023) (citing Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 846 n.5 (2d Cir. 2013) (". . . a plaintiff's injury can have multiple but-for causes, each one of which may be sufficient to support liability. Requiring proof that a prohibited consideration was a but-for cause of an adverse action does not equate to a burden to show that such consideration was the 'sole' cause.") (internal quotation marks omitted))

      Discriminatory intent under Section 1981 may be proven by either "direct or indirect evidence." Minto v. Molloy Univ., No. 16CV276KAMAYS, 2024 WL 436956, at *7 (E.D.N.Y. Feb. 6, 2024). Direct evidence might include "a disparaging remark about a plaintiff's

protected class, or a written policy that explicitly discriminates based on a protected characteristic." Id. (internal citations omitted). Indirect evidence of racial discrimination "generally involves proof that the defendant treated similarly situated comparators outside the plaintiff's protected class more favorably than it treated the plaintiff." Id.; see also Hu v. City of New York, 927 F.3d 81, 101 (2d Cir. 2019) ("[T]o prevail on a section 1981 claim, a plaintiff must allege at least one instance in which he was treated differently from a similarly situated non-minority.") "If a [Section 1981] plaintiff seeks to draw inferences of discrimination by showing that he was similarly situated to other individuals to whom he compares himself, the situations 'need not be identical, but there should be a reasonably close resemblance of facts and circumstances.'" Bishop v. Toys R US-NY, LLC, No. 04 CIV. 9403(PKC), 2009 WL 440434, at *6 (S.D.N.Y. Feb. 19, 2009), aff'd sub nom. Bishop v. Toys R Us, 385 F. App'x 38 (2d Cir. 2010) (quoting Lizardo v. Denny's, Inc., 270 F.3d 94, 101 (2d Cir. 2001)).

Under Section 1981, disparate treatment can suffice to show discriminatory intent for purposes of a motion to dismiss. See, e.g., Henderson v. Golden Corral Franchising Sys., Inc., 663 F. Supp. 3d 313, 328-29 (S.D.N.Y. 2023) ("By alleging multiple instances of [defendant's] more favorable treatment of similarly situated, non-minority franchisees, where such franchisees were purportedly given opportunities to cure comparable operational and health defaults that were not afforded to [plaintiff], [plaintiff] has met its minimal burden to demonstrate facts suggesting an inference of discriminatory motivation [at the motion to dismiss stage of a Section 1981 case].");  Kwan v. Schlein, 441 F. Supp. 2d 491, 500 (S.D.N.Y. 2006) (denying motion to dismiss Section 1981 claim where Asian plaintiff, who was a co-author of a published book, pled that her co-author and publishing executives denied her ongoing

participation in later editions of the book, "while treating all other similarly situated non-minority participants differently").

        "Allegations of discriminatory comments directed at a plaintiff's racial group are [another] recognized method of establishing discriminatory intent." Kirkland-Hudson v. Mount Vernon City Sch. Dist., 665 F. Supp. 3d 412, 455 (S.D.N.Y. 2023) (citing Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 91 (2d Cir. 1996)); Said v. NYC Health & Hosp. Corp., No. 123CV03313OEMJAM, 2024 WL 1769317, at *4 (E.D.N.Y. Apr. 24, 2024) (in a Title VII case, finding that "at least one overtly discriminatory statement . . . combined with Plaintiff's allegations of disparate treatment, suffice to plead an inference of discrimination"); Smith v. K & F Indus., Inc., 190 F. Supp. 2d 643, 651 (S.D.N.Y. 2002) (denying defendant summary judgment on Title VII claim where "offensive remarks are combined with other evidence of discriminatory intent") (internal quotations omitted). A "court may [likewise] consider [a decisionmaker's] failure to conduct an adequate investigation or undertake an appropriate response [to alleged discriminatory conduct] as evidence of discrimination or liability." Hall v. New York City Dep't of Transp., 701 F. Supp. 2d 318, 332 (E.D.N.Y. 2010) (citing Sassaman v. Gamache, 566 F.3d 307, 314-15 (2d Cir. 2009)).

        "[I]n order to make out a claim for individual liability under § 1981, a plaintiff must demonstrate 'some affirmative link to causally connect the actor with the discriminatory action,'" and liability must "'be predicated on the actor's personal involvement.'" Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 75 (2d Cir. 2000) (quoting Allen v. Denver Pub. Sch. Bd., 928 F.2d 978, 983 (10th Cir. 1991)).

    **B.**    **Analysis**

        Defendants do not dispute that J.D. is a member of a racial minority group and that his expulsion from Winston Prep – a private high school – involves a contractual right

protected by Section 1981.[4]  Accordingly, the sole issue before the Court for purposes of

Plaintiff's Section 1981 claim is whether the Amended Complaint plausibly alleges that race was

the "but for" cause of J.D.'s expulsion from Winston Prep in March 2020.

       In seeking to meet this pleading burden, the Amended Complaint cites a number

of incidents at Winston Prep involving sexual misconduct, in which Plaintiff argues that non-

African-American students received more lenient treatment than he received.  (Am. Cmplt. (Dkt.

No. 41) ¶¶ 51-55 (alleging that "two younger white girls" "harass[ed]" and "cyberbully[ied]"

J.D., including by sending him "sexually inappropriate text messages," but faced "no

discipline"); id. ¶ 106 (alleging that "Jane Doe was never disciplined for preying on two virgin

underclassmen with severe learning disabilities"))  More generally, the Amended Complaint

cites, inter alia, Defendant DeHaven's failure to properly discipline students who had used the "n

word," his alleged lack of interest in programs aimed at eliminating racial discrimination at the

School, and his removal of a Black Lives Matter poster from a teacher's office (see id. ¶¶ 25-30,

38-43) as evidence of his discriminatory intent.

       Before addressing Plaintiff's disparate treatment allegations, the Court

summarizes the conduct in which – according to the Amended Complaint – J.D. engaged:

(1) 15-year-old J.D. had a consensual sexual encounter with the 18-year-old Jane Doe in January

2020 at her behest; (2) the encounter was videotaped at Jane Doe's request; (3) J.D. possessed a

copy of the video; (4) in the weeks that followed this sexual encounter, J.D. and Jane Doe

---

[4]  Section 1981 protects "the enjoyment of all benefits, privileges, terms, and conditions of the
contractual relationship."  42 U.S.C. § 1981(b).  New York courts have held that "an implied
contract arises" when a student attends a private university.  Tripp v. Long Island Univ., 48 F.
Supp. 2d 220, 224 (E.D.N.Y. 1999) (citing Carr v. St. John's University, 231 N.Y.S.2d 410, 413
(2d Dep't 1962))  "The implicit terms of such a contract are that the university will act in good
faith toward the student and the student will fulfill the university's academic requirements and
comply with its ethical, procedural, and other standards."  Id.

discussed "hooking up" again; (5) on the morning of March 3, 2020, Jane Doe sent a text

message to J.D. in which she told him that they were "done" and that she was "not doing it

anymore"; (6) in response, J.D. texted Jane Doe, "U know have videos" and "Do u want me to

show u," along with a copy of the video; and (7) Jane Doe replied by asking whether J.D. was

threatening her, and then wrote "DO IT!!! OKAY JUST DELETE IT AND I'LL DO IT."  (Am.

Cmplt. (Dkt. No. 41) ¶¶ 65-75)

   Acknowledging that the Amended Complaint asserts that J.D. "immediately

deleted the video" after Jane Doe asked him to do so; that J.D.'s texts were "not meant as a threat

of any kind"; that J.D. "never intended to share the video with anyone new"; and that J.D. told all

of this to Jane Doe in person on March 3, 2020 (id. ¶¶ 76, 79), there is no dispute that J.D. texted

the video of the sexual encounter to Jane Doe on the morning of March 3, 2020, in the

circumstances described above.  (Id. ¶ 74)  J.D.'s response to Jane Doe's statement that she was

"not doing it anymore" could be read as – and was understood by Jane Doe as – a threat to

disclose the video if Jane Doe did not agree to have sex with him.  Accordingly, the misconduct

for which J.D. was expelled was what appeared to be an effort to coerce a fellow student and

former sexual partner into having sex with him again.

   The Amended Complaint does not cite any other incident at Winston Prep that

involved an effort by one student to coerce another into having sex.  In alleging disparate

treatment, however, the Amended Complaint cites incidents at Winston Prep that involved sexual

misconduct by non-African-American students, in which those students were not disciplined.

   For example, the Amended Complaint states that the half-white, half-Asian-

American 18-year-old student Jane Doe – who proposed and had consensual sexual intercourse

18

with the 15-year-old J.D. and the 14-year-old X.Y. – was not disciplined in any fashion by the School, even though her conduct constituted statutory rape.  (Id. ¶ 66, 81-82, 103, 106)

The Amended Complaint also alleges that in October 2019, Plaintiff was "cyberbullied by two younger white girls" who "sent him sexually inappropriate text messages, including graphic descriptions of sexually transmitted diseases."  (Id. ¶ 51)  J.D. asked the girls to stop their texting, but they "persisted," "incessantly" texting and messaging J.D., and calling him from different blocked numbers.  (Id. ¶ 52)  J.D.'s friend then messaged the girls, "threatening them to prevent further harassment."  (Id. ¶ 53)  After the girls complained to Defendants DeHaven and Haggerty, J.D. was "immediately disciplined" for the friend's text (by being prohibited from attending a class field trip).  (Id.)  "[N]o discipline for the girls followed"; their behavior was dismissed as "the product of 'younger girls having a crush' on J.D."  (Id. ¶ 55)

According to Plaintiff,

> J.D.'s expulsion was based on alleged conduct more akin to cyberbullying, cyberstalking and harassment than statutory rape, which Jane Doe committed in the subject sexual encounter.  Still, JD was expelled without a real investigation, evidence review or a meaningful opportunity to defend himself or appropriate notice to Plaintiff's Mother.  On the other hand, Jane Doe, committed a more serious policy violation, and statutory rape of XY, yet she had no negative consequences, DeHaven and Haggerty did not question the veracity of her claim for a second, and they allowed her to tell her parents on her own time.  The treatment of Jane Doe, and to a lesser extent the cyberstalking girls, was certainly disparate to the treatment JD, and other African American men endured at Winston Prep.

(Pltf. Opp. (Dkt. No. 60) at 25)  In sum, Plaintiff argues that J.D. was treated much more harshly than similarly situated comparators outside of his protected class who had engaged in similar forms of sexual misconduct or sex-related bullying.

In asserting that Defendant DeHaven acted with discriminatory intent in expelling J.D., the Amended Complaint also alleges that on "multiple occasions" DeHaven "excuse[d]" students' use of the word "nigger" by "cit[ing] the white students' learning disabilities."  (Am.

Cmplt. (Dkt. No. 41) ¶ 29)  As discussed above, in determining whether a plaintiff has adequately

alleged that a defendant acted with discriminatory intent, a court may consider pled facts

suggesting that that defendant did not "undertake an appropriate response [to alleged

discriminatory conduct]."  Hall, 701 F. Supp. 2d at 332.

Defendants do not address Plaintiff's disparate treatment argument in their reply

brief (see Def. Reply (Dkt. No. 59) at 6-9), and therefore they have effectively conceded the

point.  See, e.g., Vann v. Persico, No. 20-CV-628 (KMK), 2022 WL 4368110, at *9 (S.D.N.Y.

Sept. 20, 2022) ("'[B]y failing to respond to that argument in its Reply Memorandum, [Plaintiff]

concedes the point for purposes of its Motion.'") (quoting Cornelius v. Macy's Retail Holdings,

Inc., No. 18-CV-678, 2019 WL 11816537, at *2 (W.D.N.Y. Aug. 5, 2019)).

In any event, in determining whether the Amended Complaint adequately pleads

disparate treatment, the issue is whether there is "a reasonably close resemblance of facts and

circumstances," Lizardo, 270 F.3d at 101, between J.D.'s conduct and the sexual misconduct cited

in the Amended Complaint, and whether the sexual misconduct cited in the Amended Complaint

is of "comparable seriousness," Raspardo v. Carlone, 770 F.3d 97, 126 (2d Cir. 2014) (citations

omitted), to the conduct that J.D. engaged in.

The Court concludes that the Amended Complaint plausibly alleges that Jane Doe

and the girls who cyberbullied J.D. in 2019 are similarly situated to J.D.  As to Jane Doe – given

that she committed the crime of statutory rape in having sexual intercourse with the 14-year-old

X.Y., see New York Penal Law, § 130.30 (2020) (defining Rape in the Second Degree as

occurring when someone "being eighteen years old or more . . . engages in sexual intercourse

with another person less than fifteen years old") – her conduct is arguably more serious than the

conduct engaged in by J.D.  Moreover, the 18-year-old Jane Doe allegedly planned, initiated, and

directed the sexual intercourse with the 15-year-old J.D. and the 14-year-old X.Y., both of whom suffered from "severe learning disabilities." (Am. Cmplt. (Dkt. No. 41) ¶¶ 66-67, 106)

There is also arguably a "reasonably close resemblance" between the sex-related cyberbullying engaged in by J.D.'s female classmates and J.D.'s sexually coercive texts sent to Jane Doe, see Lizardo, 270 F.3d at 101, and one could view the girls' conduct as of "comparable seriousness" to that of J.D. Raspardo, 770 F.3d at 126. And given that Jane Doe and the cyberbullying female classmates suffered no discipline for their misconduct (Am. Cmplt. (Dkt. No. 41) ¶ 55), while J.D. was expelled, disparate treatment has been adequately pled for purposes of Plaintiff's Section 1981 claim against Defendants Winston Prep and DeHaven. Accordingly, Defendants' motion to dismiss will be denied as to Plaintiff's Section 1981 claim against Winston Prep and DeHaven.

As to Defendant Hagerty, however, Plaintiff's Section 1981 claim is insufficient. The Amended Complaint does not plead facts demonstrating that Hagerty played a role in the decision to expel J.D., much less that J.D.'s race was the "but-for" cause of any decision by Hagerty to expel J.D.[5] Indeed, Plaintiff asserts that DeHaven was "[t]he main decision-maker in this matter." (Pltf. Opp. (Dkt. No. 60) at 21) Accordingly, Defendants' motion to dismiss Plaintiff's Section 1981 claim will be granted as to Defendant Hagerty.

---

[5] To the extent that the Amended Complaint alludes to the "Defendants" having engaged in certain conduct (see, e.g., ¶ 89 (alleging that "[a]fter Defendants made the decision to remove J.D. from Winston Prep"), such allegations are not sufficient to demonstrate Hagerty's liability. See, e.g., Milton v. Wazed, No. 16CV4542MKBJO, 2018 WL 2074179, at *7 n.16 (E.D.N.Y. Mar. 30, 2018) ("The pleading standard set forth in Rule 8 of the Federal Rules of Civil Procedure 'is not satisfied by lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct.'") (quoting Ludwig's Drug Store, Inc. v. Forest City Enterprises, Inc., No. 13-CV-6045, 2016 WL 915102, at *10 (E.D.N.Y. Mar. 4, 2016)).

### III.    TITLE VI, TITLE IX, AND REHABILITATION ACT CLAIMS

Defendants contend that Plaintiff's Title VI, Title IX, and Rehabilitation Act claims (Second, Third, and Fifth Causes of Action) must be dismissed because the Amended Complaint does not adequately allege that Winston Prep received federal funding.  (Def. Br. (Dkt. No. 57) at 14-18)

#### A.    Applicable Law

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.  To state a claim under Title VI, "a plaintiff must plausibly allege not only that the defendant was an entity receiving federal funding . . . but also that the federal funds have been made available primarily for providing employment."  Sulehria v. New York, No. 13-CV-6990 AJN, 2014 WL 4716084, at *5 (S.D.N.Y. Sept. 19, 2014) (citing Ass'n Against Discrimination in Emp., Inc. v. City of Bridgeport, 647 F.2d 256, 276 (2d Cir. 1981)).

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Title IX's implementing regulations define "federal financial assistance," in relevant part, to include "[a] grant or loan of Federal financial assistance," and "[a]ny other contract, agreement, or arrangement which has as one of its purposes the provision of assistance to any education program or activity, except a contract of insurance or guaranty."  34 C.F.R. § 106.2.  To assert a claim under Title IX, "a plaintiff must adequately allege," inter alia, that he or she was "denied the benefits of or excluded from participation in a federally funded education program or activity."  Doe v. Sacks, 714 F. Supp. 3d 402, 410-11 (S.D.N.Y. 2024).

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a).  To establish a prima facie case under the Rehabilitation Act, a plaintiff must allege, inter alia, that he or she "has been denied benefits of or excluded from participating in a federally funded program or special service[.]" Bryant v. New York State Educ. Dep't, 692 F.3d 202, 216 (2d Cir. 2012).

### B.    Analysis

The Amended Complaint alleges that Winston Prep has received "Federal financial assistance" under Title VI, Title IX, and the Rehabilitation Act in the form of Federal grant funding, a 2020 loan under the Paycheck Protection Program ("PPP"), and as a result of the school's status as a Section 501(c)(3) tax-exempt organization.  (Am. Cmplt. (Dkt. No. 41) ¶ 11)

#### 1.    Federal Grant Funding

In the Amended Complaint, Plaintiff asserts that Winston Prep's "IRS Form 990" indicates that the School "received $4,564,255 in the form of federal grants and other grants in 2020." (Id.)  The Amended Complaint cites to Guidestar – a third-party website – in support of this allegation. (Id. ¶ 11 n.1 (citing https://www.guidestar.org/profile/13-3085860)).  The Amended Complaint also alleges – "upon information and belief" – that "some of the students at Winston Prep receive funding for their education from federal grants and/or loans, including funding from the Individuals with Disabilities Education Act" ('IDEA')." (Id. ¶ 11 n.3 (citing https://winstonprep.jobscheckin.com/our-campuses/ny/parent-information/financing-a-winston-education/))  The Amended Complaint provides no further details regarding Federal grant funding.

As to IRS Form 990, Defendants assert that "the three IRS 990 forms available via Plaintiff's cited link are for the years 2017, 2018, and 2019," and that Plaintiff has not cited to any IRS Form 990 for 2020. Defendants further argue that, in any event, the IRS 990 forms referenced by Plaintiff "do not reflect any receipt of federal funding." (Def. Br. (Dkt. No. 57) at 15) In support of their arguments, Defendants have submitted copies of the three Winston Prep IRS Form 990s from the Guidestar website that Plaintiffs cite to. (See Def. Br., Ex. B. (Form 990s from Guidestar) (Dkt. No. 57-2)) These documents do not indicate that Winston Prep has received any Federal funding, much less the "$4,564,255 in . . . federal grants" cited in the Amended Complaint. (Am. Cmplt. (Dkt. No. 41) ¶ 11)

As to IDEA, Defendants contend that the hyperlink in the Amended Complaint directs the reader to a third-party website that is not affiliated with Winston Prep. The website merely states that the "Individuals with Disabilities Act may entitle your child to reimbursement or funding. We suggest that all families investigate these options." (Def. Br., Ex. D (www.winstonprep.jobsceckin.com Screenshot) (Dkt. No. 57-4) at 2)[6] According to Defendants, this website at best suggests that the parents of Winston Prep students may have been encouraged to pursue tuition assistance through IDEA – not that Winston Prep received funding pursuant to IDEA. (Def. Br. (Dkt. No. 57) at 17)

Plaintiff does not address these arguments in her opposition brief. (See Pltf. Opp. (Dkt. No. 60) at 26-28) Nor has Plaintiff provided any other explanation – or any further documentation – concerning the Federal grant funding referenced in the Amended Complaint. Given that (1) the websites cited in the Amended Complaint do not support Plaintiff's allegations concerning Federal grant funding; and (2) Plaintiff does not respond to Defendants' arguments

---

[6] The hyperlink cited in the Amended Complaint is no longer functional.

regarding the Amended Complaint's alleged deficiencies regarding Federal grant funding, the Court concludes that Plaintiff's allegations regarding Federal grant funding are insufficient.

### 2.      **Paycheck Protection Program Loan**

The Amended Complaint also alleges that Winston Prep received federal funding in the form of a $4,044,400 loan in 2020 pursuant to the Paycheck Protection Program.  (Am. Cmplt. (Dkt. No. 41) ¶ 11)  Defendants respond that this Court "do[es] not need to assess the applicability of a PPP loan," because "Plaintiff acknowledges her son was expelled on March 4, 2020, well before PPP loans were even statutorily created[.]"  (Def. Br. (Dkt. No. 57) at 16)

Acknowledging that some courts have held that receipt of PPP loans may constitute "Federal financial assistance" for purposes of Title VI, Title IX, and the Rehabilitation Act, see Karanik v. Cape Fear Acad., Inc., 608 F. Supp. 3d 268, 284 (E.D.N.C. 2022) (private high school that received a PPP loan "had to comply with Title IX for the life of its loan"); Awah v. Mansfield Kaseman Health Clinic, No. 8:21-CV-00938-PX, 2021 WL 6197415, at *4-5 (D. Md. Dec. 30, 2021) (same for Title VI); Husbands v. Fin. Mgmt. Sols., LLC, No. GJH-20-3618, 2021 WL 4339436, at *8 (D. Md. Sept. 23, 2021) (same for the Rehabilitation Act), Plaintiff does not address Defendants' argument that Winston Prep's received its PPP loan after J.D. had been expelled.

The Paycheck Protection Program ("PPP") was created as part of the Coronavirus Aid, Relief, and Economic Security Act (commonly known as the "CARES Act"), which Congress enacted on March 27, 2020 in response to the COVID-19 pandemic.  Pub. L. No. 116-136, § 1102, 134 Stat. 281, 286–94 (2020) (codified at 15 U.S.C. § 636(a)); see Pharaohs GC, Inc. v. U.S. Small Bus. Admin., 990 F.3d 217, 223-24 (2d Cir. 2021) (providing an overview of the CARES Act and the PPP).  Under the PPP, employers could obtain loans from the Small

Business Administration ("SBA") that would later be forgiven if the employer used the funds for

"payroll costs . . . , mortgage interest, rent, or utilities." Pharaohs, 990 F.3d at 224.

           Here, J.D. was expelled from Winston Prep on March 4, 2020 (Am. Cmplt. (Dkt.

No. 41) ¶ 99), and Congress passed the CARES Act several weeks later.  On April 15, 2020,

Winston Prep received SBA approval for a PPP loan of $4,044,400.  (Def. Br., Ex. C (ProPublica

Tracking PPP Page for Winston Prep) (Dkt. No. 57-3) at 1-2)[7]  Accordingly, the last

discriminatory action alleged in the Amended Complaint – J.D.'s expulsion – took place before

Congress enacted the CARES Act and before Winston Prep received the PPP loan authorized by

that Act.  The Amended Complaint thus does not plausibly allege that Winston Prep received

qualifying "Federal financial assistance" – in the form of a PPP loan – at a time

contemporaneous with the alleged discriminatory conduct.  See, e.g., Crandall v. Paralyzed

Veterans of Am., 146 F.3d 894, 896 (D.C. Cir. 1998) (affirming dismissal of Rehabilitation Act

claim where plaintiff was fired on September 10, 1992, and defendant's federal grant began on

September 11, 1992); Stephanidis v. Yale Univ., 652 F. Supp. 110, 113 (D. Conn. 1986), aff'd, 814

F.2d 654 (2d Cir. 1987) (upholding dismissal of Rehabilitation Act claim where plaintiff had not

pled "receipt and use of federal financial assistance at the relevant time"); Carmody v. Vill. of

Rockville Ctr., 661 F. Supp. 2d 299, 338 (E.D.N.Y. 2009) (granting defendants summary

judgment where "plaintiff . . . failed to offer any evidence whatsoever to support his claim that

[defendants] received federal funds aimed at employment during the time that plaintiff was

employed with the [Rockville Centre Police Department], thereby subjecting them to potential

liability under Title VI").

---

[7] The exhibit submitted by Defendants is a printout of a webpage hyperlinked in the Amended
Complaint.  (See Am. Cmplt. (Dkt. No. 41) ¶ 11 n.2)

In sum, the alleged PPP loan that Winston Prep received does not constitute "Federal financial assistance" for purposes of Plaintiff's claims under Title VI, Title IX, and the Rehabilitation Act.

### 3.    Winston Prep's Section 501(c)(3) Tax-Exempt Status

The Amended Complaint alleges that Winston Prep receives "Federal financial assistance" via the school's status as a Section 501(c)(3) tax-exempt non-profit organization. (Am. Cmplt. (Dkt. No. 41) ¶ 11)

The Second Circuit has not addressed whether Section 501(c)(3) tax-exempt status constitutes "Federal financial assistance" under Title VI, Title IX, or the Rehabilitation Act, and courts addressing this issue have reached conflicting results. Compare Buettner-Hartsoe v. Baltimore Lutheran High Sch. Ass'n, 96 F.4th 707, 715 (4th Cir. 2024) ("[T]ax exempt status pursuant to 26 U.S.C. § 501(c)(3) does not equate to 'receiving Federal financial assistance' for purposes of Title IX."), Doe by & through Doe v. Currey Ingram Acad., 721 F. Supp. 3d 682, 688 (M.D. Tenn. 2024) ("[T]ax-exempt status does not mean that [defendant] has been extended '[f]ederal financial assistance' . . . within the scope of Title IX."), Doe v. Horne, No. CV-23-00185-TUC-JGZ, 2023 WL 11892137, at *4 (D. Ariz. Dec. 11, 2023) ("501(c)(3) tax-exempt status is not the type of grant or arrangement that qualifies as federal financial assistance" under Title IX or the Rehabilitation Act), Johnny's Icehouse, Inc. v. Amateur Hockey Ass'n Illinois, Inc., 134 F. Supp. 2d 965, 972 (N.D. Ill. 2001) ("[T]ax exempt status, without more, is . . . insufficient to subject [defendant] to the antidiscrimination requirements of Title IX."), and Bachman v. Am. Soc. of Clinical Pathologists, 577 F. Supp. 1257, 1264 (D.N.J. 1983) ("[T]he Rehabilitation Act was not intended to cover tax-exempt institutions absent any further affirmative federal financial assistance.") with E.H. by & through Herrera v. Valley Christian Acad., 616 F. Supp. 3d 1040, 1050 (C.D. Cal. 2022) ("Tax-exempt status confers a federal financial benefit that obligates

compliance with Title IX."), <u>Fulani v. League of Women Voters Educ. Fund</u>, 684 F. Supp. 1185, 1192 (S.D.N.Y. 1988) (defendant "receives federal assistance indirectly through its tax exemption and directly through grants" for purposes of Title VI and Title IX), <u>and</u> <u>McGlotten v. Connally</u>, 338 F. Supp. 448, 461 (D.D.C. 1972) (tax exemption constitutes "federal financial assistance" under Title VI).

Title VI, Title IX, and the Rehabilitation Act each refer to a "program or activity receiving Federal financial assistance." <u>See</u> 42 U.S.C. § 2000d (Title VI); 20 U.S.C. § 1681(a) (Title IX); 29 U.S.C. § 794 (Rehabilitation Act). In connection with Title IX, the Fourth Circuit has construed "receiving Federal financial assistance" to mean

> taking or accepting federal financial aid, help, or support. Thus, the plain text of Title IX contemplates the transfer of funds from the federal government to an entity. This reading is consistent with Title IX's neighboring provision which grants enforcement authority to agencies "empowered to extend Federal financial assistance . . . by way of grant, loan, or contract other than a contract of insurance or guaranty." 20 U.S.C. § 1682. This neighboring provision's list – "grant, loan, or contract" – suggests very strongly that[ ]§ 1681(a)'s "Federal financial assistance" should be read similarly, and thus limited to affirmative forms of assistance.

<u>Baltimore Lutheran</u>, 96 F.4th at 712 (footnote omitted).

This reading is bolstered by Federal regulations interpreting the phrase "Federal financial assistance." For example, the Department of Education's implementing regulations for Title IX define "Federal financial assistance" to include

> (1) A grant or loan of Federal financial assistance, including funds made available for:
>
> > (i) The acquisition, construction, renovation, restoration, or repair of a building or facility or any portion thereof; and
> >
> > (ii) Scholarships, loans, grants, wages, or other funds extended to any entity for payment to or on behalf of students admitted to that entity, or extended directly to such students for payment to that entity.

(2) A grant of Federal real or personal property or any interest therein, including surplus property, and the proceeds of the sale or transfer of such property, if the Federal share of the fair market value of the property is not, upon such sale or transfer, properly accounted for to the Federal Government.

(3) Provision of the services of Federal personnel.

(4) Sale or lease of Federal property or any interest therein at nominal consideration, or at consideration reduced for the purpose of assisting the recipient or in recognition of public interest to be served thereby, or permission to use Federal property or any interest therein without consideration.

(5) Any other contract, agreement, or arrangement which has as one of its purposes the provision of assistance to any education program or activity, except a contract of insurance or guaranty.

34 C.F.R. § 106.2; see also 31 C.F.R. § 28.105 (same). Each of the examples cited above "contemplate[] the flow of assets or resources from the federal government to an entity." Baltimore Lutheran, 96 F.4th at 712 n.6. And "conspicuously absent from that laundry list is [an] income tax exemption." Johnny's Icehouse, 134 F. Supp. 2d at 971.

This reading is also consistent with Supreme Court decisions holding that Federal financial assistance does not encompass indirect economic benefits. The Court has, for example, held that Section 504 of the Rehabilitation Act "covers those who receive the aid, but does not extend as far as those who benefit from it." U.S. Dep't of Transp. v. Paralyzed Veterans of Am., 477 U.S. 597, 607 (1986). While "most federal assistance has 'economic ripple effects,'" the Court has "rejected the argument that those indirect economic benefits can trigger statutory coverage." Id. Similarly, "Title IX coverage is not triggered when an entity merely benefits from federal funding." Nat'l Collegiate Athletic Ass'n v. Smith, 525 U.S. 459, 468 (1999).

Although Section 501(c)(3) treatment "operates in fact as a subsidy in favor of the particular activities these groups are pursuing," McGlotten, 338 F. Supp. at 462, and "even though 'exemptions and deductions [in the tax code] . . . are like cash subsidies,' they are not 'in all respects identical.'" Baltimore Lutheran, 96 F.4th at 713 (quoting Regan v. Tax'n with

Representation of Wash., 461 U.S. 540, 544 n.5 (1983)).  "A subsidy involves the direct transfer of public monies to the subsidized enterprise and uses resources exacted from taxpayers as a whole.  An exemption, on the other hand, involves no such transfer."  Walz v. Tax Comm'n of New York, 397 U.S. 664, 690 (1970) (Brennan, J., concurring).  This Court agrees with the Fourth Circuit that the "withholding of a tax burden" envisioned by Section 501(c)(3) is more akin to an "indirect benefit" than to the direct transfer of funds referenced in Title VI, Title IX, and the Rehabilitation Act.  Baltimore Lutheran, 96 F.4th at 714.

Moreover, "since Title IX's inception over fifty years ago, it has never been applied to organizations based solely on their tax exempt status."  Id.  Indeed, the Internal Revenue Service "has not issued regulations requiring tax exempt organizations to comply with Title IX" – or Title VI or the Rehabilitation Act – "nor has it revoked tax exemption based on gender discrimination."  Id. at 713 n.7.  Nor has Plaintiff cited case law suggesting that "Congress intended to condition the receipt of 501(c)(3) tax exempt status on an entity's promise to comply with federal antidiscrimination statutes."  Horne, 2023 WL 11892137, at *3.

For all these reasons, the Court concludes that Winston Prep's status as a tax-exempt Section 501(c)(3) organization is not sufficient to demonstrate that it receives "Federal financial assistance" for purposes of Title VI, Title IX, or the Rehabilitation Act.

*        *        *        *

Because the Amended Complaint does not plausibly allege that Winston Prep was receiving Federal funding as of the time of the alleged discriminatory action, Plaintiff's Title VI, Title IX, and Rehabilitation Act claims will be dismissed.

## IV.    AMERICANS WITH DISABILITIES ACT
##          AND REHABILITATION ACT CLAIMS

Defendants contend that Plaintiff's ADA and Rehabilitation Act claims must be

dismissed because the Amended Complaint "fails to adequately plead a prima facie case of

disability discrimination." (Def. Br. (Dkt. No. 57) at 19)

To establish a prima facie case of disability discrimination under the ADA and

Rehabilitation Act, a plaintiff must plead facts showing

> "(1) [t]hat she is a qualified individual with a disability; (2) that the defendants are
> subject to one of the Acts; and (3) that she was denied the opportunity to
> participate in or benefit from defendants' services, programs, or activities, or was
> otherwise discriminated against by defendants, by reason of her disability."

Harris v. Mills, 572 F.3d 66, 73-74 (2d Cir. 2009) (quoting Powell v. Nat'l Bd. of Med.

Examiners, 364 F.3d 79, 85 (2d Cir. 2004)). "[T]he standards are the same for actions under both

[the ADA and the Rehabilitation Act]." Id. (citing Powell 364 F.3d at 85).

Defendants argue, inter alia, that the Amended Complaint does not allege "any

specific requested accommodation that was denied or any other adverse action taken against J.D.,

by reason of his disability." (Def. Br. (Dkt. No. 57) at 21)  Plaintiff does not respond to these

arguments in her opposition brief, nor does she make any attempt to clarify the factual basis for

the Amended Complaint's disability discrimination claims.  (See Pltf. Opp. (Dkt. No. 60) at 29-

30)  In their reply brief, Defendants argue that Plaintiff's ADA and Rehabilitation Act claims

should be deemed abandoned.  (Def. Reply (Dkt. No. 59) at 10-11)

A court may "deem a claim abandoned when a plaintiff fails to respond to a

defendant's arguments that the claim should be dismissed." Lipton v. Cnty. of Orange, NY, 315

F. Supp. 2d 434, 446 (S.D.N.Y. 2004); see also Romeo & Juliette Laser Hair Removal, Inc. v.

Assam I LLC, No. 08-CV-442 (TPG), 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014) ("At

the motion to dismiss stage . . . , a plaintiff abandons a claim by failing to address the defendant's

arguments in support of dismissing that claim.").

Because Plaintiff has not responded to Defendants' arguments that the Amended

Complaint does not make out a prima facie of disability discrimination under either the ADA or

the Rehabilitation Act, these claims will be deemed abandoned, and Defendants' motion to

dismiss these claims will be granted.[8]

## V.    NYSHRL CLAIM

The Amended Complaint also alleges race discrimination in violation of the

NYSHRL.  (Am. Cmplt. (Dkt. No. 41) ¶¶ 179-87)  Defendants contend that Plaintiff's NYSHRL

claim should be dismissed for failure to state a claim.  (See Def. Br. (Dkt. No. 57) at 21-24)

The NYSHRL makes it unlawful "for an educational institution . . . to permit the

harassment of any student . . . by reason of his race[.]"  N.Y. Exec. Law § 296(4).  "In August

---

[8]  Defendants also argue that Plaintiff's ADA claim must be dismissed because Plaintiff did not
exhaust her administrative remedies by filing a charge of discrimination with the Equal
Employment Opportunity Commission ("EEOC").  (Def. Br. (Dkt. No. 57) at 18-19)  This
argument is misguided.  EEOC enforcement of the ADA is implicated when a person alleges
disability discrimination in connection with employment.  See 42 U.S.C. § 12117(a) (granting
"powers, remedies, and procedures . . . to the [Equal Employment and Opportunity]
Commission, to the Attorney General, or to any person alleging discrimination on the basis of
disability in violation of any provision of this chapter . . . concerning employment"); see also 42
U.S.C. § 2000e-5 (requiring that "[a] charge [of discrimination] under this section shall be filed
within one hundred and eighty days after the alleged unlawful employment practice occurred").
The cases cited by Defendants are not to the contrary; all involve alleged discrimination in
employment.  See Pilman v. New York City Hous. Auth., 64 F. App'x 293, 296 (2d Cir. 2003)
(holding, in a case related to alleged discrimination at work, that plaintiff's ADA claim was
barred for failure to exhaust administrative remedies); Woldeselassie v. Am. Eagle Airlines, Inc.,
647 F. App'x 21, 23 (2d Cir. 2016) (same); Demarco v. JP Morgan Chase, No. 10-CV-4110 NGG
VVP, 2011 WL 1837787, at *2 (E.D.N.Y. May 13, 2011) (same); Curto v. Edmundson, 392 F.3d
502, 503 (2d Cir. 2004) (affirming the dismissal of Age Discrimination in Employment Act claim
for failure to exhaust administrative remedies).  Because Plaintiff's ADA claim has no
connection with employment, she was not required to file a charge of discrimination with the
EEOC.

2019, the NYSHRL was amended to provide that it 'shall be construed liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws, including those laws with provisions worded comparably to the provisions of [the NYSHRL], have been so construed.'" Zabar v. New York City Dep't of Educ., No. 18 CIV. 6657 (PGG), 2024 WL 4289641, at *11 n.5 (S.D.N.Y. Sept. 24, 2024) (quoting N.Y. Exec. Law § 300) (alteration in original). "[C]ourts in this District have interpreted the [August 2019] amendment 'to render the standard for claims under the NYSHRL closer to the standard of the NYCHRL'" which is "less demanding of plaintiffs" than the standards of Section 1981. Dixon v. City of New York, No. 23-CV-8941 (JGK), 2025 WL 50140, at *12 (S.D.N.Y. Jan. 7, 2025) (quoting Livingston v. City of N.Y., 563 F. Supp. 3d 201, 232 n.14 (S.D.N.Y. 2021)). Under this "less demanding" standard, a "plaintiff must only 'plead[] facts sufficient to plausibly allege that [he or she] was treated less well because of a protected characteristic." Foster v. Consol. Edison Co. of New York, Inc., No. 21CV3570(DLC), 2021 WL 4461163, at *1 (S.D.N.Y. Sept. 29, 2021) (quoting Brightman v. Physician Affiliate Grp. of N.Y., P.C., No. 20cv4290 (DLC), 2021 WL 1999466, at *7-8 (S.D.N.Y. May 19, 2021)) (second alteration added).

Moreover, "while a Section 1981 claim requires plausible pleading of 'but for' causation, claims under the NYSHRL are properly pled so long as the plaintiff plausibly pleads discrimination as a 'motivating factor.'" Minto v. Molloy Coll., No. 16CV276KAMAYS, 2021 WL 1394329, at *10 (E.D.N.Y. Jan. 21, 2021), report and recommendation adopted, No. 16-CV-276, 2021 WL 804386 (E.D.N.Y. Mar. 3, 2021) (quoting Cardwell v. Davis Polk & Wardwell LLP, No. 1:19-CV-10256-GHW, 2020 WL 6274826, at *21 (S.D.N.Y. Oct. 24, 2020)).

Here, the alleged discriminatory conduct took place in March 2020, when J.D. was expelled from Winston Prep. (Am. Cmplt. (Dkt. No. 41) ¶ 99) Accordingly, the amended

version of the NYSHRL applies. And given this Court's finding that Plaintiff has adequately

pled a race discrimination claim under Section 1981 as to Defendants Winston Prep and

DeHaven, the same finding perforce applies to Plaintiff's NYSHRL race discrimination claim,

which is governed by a "more liberal standard." Wray v. Westchester Med. Ctr. Advanced

Physician Servs., P.C., No. 21-CV-00394 (PMH), 2022 WL 3214924, at *11 n.12 (S.D.N.Y. Aug.

9, 2022); see also Balchan v. New Rochelle City Sch. District, No. 23-CV-06202 (PMH), 2024

WL 2058726, at *7 (S.D.N.Y. May 7, 2024) ("Given the Court's finding here that Plaintiff

plausibly pled a discrimination claim in violation of Title VII, Plaintiff has plausibly pled a claim

under the more liberal standard of the NYSHRL.").

> As to Defendant Hagerty, however, Plaintiff's NYSHRL race discrimination claim

fails, notwithstanding the NYSHRL's more liberal standard. As discussed above, the Amended

Complaint does not plead facts demonstrating that Hagerty played a role in the decision to expel

J.D.

> Accordingly, Defendants' motion to dismiss Plaintiff's NYSHRL claim will be

denied as to Defendants Winston Prep and DeHaven, but granted as to Defendant Hagerty.[9]

---

[9] As discussed above, the NYSHRL makes it unlawful "for an educational institution . . . to permit the harassment of any student . . . by reason of his race[.]" N.Y. Exec. Law § 296(4). Given the statute's reference to "educational institution," it does not appear that it imposes liability on individuals. Indeed, multiple courts have dismissed NYSHRL claims against individuals on this ground. See, e.g., JD1 v. Canisius Coll., No. 1:21-CV-521, 2022 WL 2308902, at *16 (W.D.N.Y. June 27, 2022) ("[C]laims under N.Y. Exec. L. § 296(4) may only be raised against educational institutions, not employees. . . . The Court will accordingly dismiss Count III as against Huckle and Maher."); Novio v. N.Y. Acad. of Art, 286 F. Supp. 3d 566, 581 (S.D.N.Y. 2017) (Section 296(4) "'applies only to education corporations, which the employees obviously are not'") (quoting TC v. Valley Cent. Sch. Dist., 777 F. Supp. 2d 577, 604 (S.D.N.Y. 2011)). Accordingly, by **July 11, 2025**, Plaintiff will show cause why her NYSHRL claim against DeHaven should not be dismissed.

## VI.   **LEAVE TO AMEND**

District courts have "broad discretion in determining whether to grant leave to amend[.]" Gurary v. Winehouse, 235 F.3d 792, 801 (2d Cir. 2000).  Leave to amend may properly be denied in cases of "'undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'" Ruotolo v. City of N.Y., 514 F.3d 184, 191 (2d Cir. 2008) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)).  "Where the possibility exists that [a] defect can be cured," leave to amend "should normally be granted" at least once.  Wright v. Ernst & Young LLP, No. 97 CIV. 2189 (SAS), 1997 WL 563782, at *3 (S.D.N.Y. Sept. 10, 1997), aff'd, 152 F.3d 169 (2d Cir. 1998) (citing Oliver Schs., Inc. v. Foley, 930 F.2d 248, 253 (2d Cir. 1991)).  Moreover, where a claim is dismissed on the grounds that it is "inadequate[ly] [pled]," there is "a strong preference for allowing plaintiffs to amend."  In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig., No. 08 MDL 1963, 2011 WL 4072027, at *2 (S.D.N.Y. Sept. 13, 2011) (citing Ronzani v. Sanofi S.A., 899 F.2d 195, 198 (2d Cir. 1990)).  However, a court may dismiss without leave to amend where amendment would be "futile."  Hutchison v. Deutsche Bank Sec. Inc., 647 F.3d 479, 491 (2d Cir. 2011).

At a February 17, 2022 pre-motion conference, this Court explained to Plaintiff that the Complaint's allegations regarding Winston Prep's receipt of federal funds were deficient, and granted Plaintiff leave to amend to cure these deficiencies.  (Feb. 17, 2022 Conf. Tr. (Dkt. No. 37) at 7-8)  This Court also warned Plaintiff that if she "does not address the alleged defects in the complaint and I later conclude that the claims are subject to dismissal, plaintiff will have to explain why I should give her further leave to amend because I am giving her an opportunity to amend now."  (Id. at 8)  After the February 17, 2022 conference, Plaintiff filed the Amended

Complaint, which contains the deficient Federal funding allegations discussed above. In her opposition brief, Plaintiff requests leave to amend but does not specify what new allegations related to Federal funding she would include in any second amended complaint. (Pltf. Opp. (Dkt. No. 60) at 29-30)

Because (1) Plaintiff was granted leave to amend after receiving guidance from the Court regarding defects in the Complaint's Federal funding allegations; (2) Plaintiff did not cure in the Amended Complaint the defects previously identified by the Court; and (3) Plaintiff has not stated what new allegations related to Federal funding she would include in any second amended complaint, the Court concludes that any further amendment as to Plaintiff's Title VI, Title IX, and Rehabilitation Act claims would be futile. Accordingly, these claims will be dismissed with prejudice. And because Plaintiff has abandoned her ADA claim, that claim will likewise be dismissed with prejudice.

As to Plaintiff's Section 1981 claim against Hagerty, however, this Court cannot find that it is impossible for Plaintiff to plausibly allege a claim against him. Accordingly, dismissal as to that claim is without prejudice. Any motion to amend as to that claim will be filed by **July 11, 2025**, and will include as an exhibit the proposed Second Amended Complaint.

## CONCLUSION

Defendants' motion to dismiss the Amended Complaint (Dkt. No. 56) is granted in part and denied in part as set forth above. The Amended Complaint's Section 1981 claim is dismissed without prejudice as to Defendant Hagerty. The Title VI, Title XI, ADA, and Rehabilitation Act claims are dismissed with prejudice as to all Defendants. The NYSHRL claim is dismissed as to Defendant Hagerty. Plaintiff will show cause by **July 11, 2025**, why the dismissal of the NYSHRL claim against Defendant Hagerty should not be with prejudice. As discussed above, Plaintiff will show cause by **July 11, 2025**, why the NYSHRL claim against

DeHaven should not be dismissed with prejudice. Defendants' motion is otherwise denied. Any motion for leave to file a Second Amended Complaint will be submitted by **July 11, 2025**.

The Clerk of Court is directed to terminate the motion (Dkt. No. 56).

Dated: New York, New York
      June 30, 2025

SO ORDERED.

Paul G. Gardephe
United States District Judge